UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x

UNITED STATES OF AMERICA,            :

    - v. -                           :

ROBERT J. LAWS, and                  :    07 Cr. ___
STACEY DEFILIPPIS,
                                        :
            Defendants.
                                        :
------------------------------------x



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: JUN 2 6 2007

07 CRIM. 576

## COUNT ONE

(Conspiracy to Commit Securities, Mail,
and Wire Fraud)

The Grand Jury charges:

**Relevant Entities and Persons**

1. At all times relevant to this Indictment, US Biofuel Holdings Inc. ("US Biofuel" or the "Company") was a New York corporation located at 40 Exchange Place, New York, New York. US Biofuel was purportedly engaged in the business of acquiring operational and non-operational petroleum tank farms and holding tanks for conversion to bio-fuel storage facilities; forming strategic alliances with various biofuel brokerages for the purpose of entering into long term contracts; and developing, building, and operating bio-fuels processing and storage facilities.

2. At all times relevant to this Indictment, ROBERT J. LAWS, the defendant, was the President, Chief Executive Officer, and Director of US Biofuel. LAWS was purported to have over 25

years of experience in investment banking, mergers and acquisitions, and corporate finance.

3. From in or about October 2006 through in or about May 2007, STACEY DEFILIPPIS, the defendant, worked as a telemarketer at the US Biofuel "boiler room" in Manhattan. In telephone calls to investors and potential investors, DEFILIPPIS held herself out as the sales manager for US Biofuel.

### Background

4. At all times relevant to this Indictment, the Securities Act of 1933 (the "Act"), as well as Regulation D ("Reg D") and Rule 506 ("Rule 506"), among others, of the rules and regulations of the SEC, provided that, subject to certain limitations and after meeting certain requirements, issuers were permitted to sell securities to investors without first registering those securities with the SEC. Such offerings are commonly known as "private placements."

5. From at least in or about October 2006 through in or about May 2007, US Biofuel issued and sold securities to investors through purported private placements without first registering the securities with the SEC (the "US Biofuel Securities"). At times, the US Biofuel Securities were sold to investors pursuant to offering materials (the "Offering Materials"). The Offering Materials included a private placement memorandum dated December 29, 2006 (the "12/29/06 PPM"), a

subscription agreement, and color brochures. The Offering Materials represented that the US Biofuel Securities were being offered pursuant to Rule 506 and Reg D. Generally, the US Biofuel Securities were sold based on oral representations made or caused to be made over the telephone by ROBERT L. LAWS, STACEY DEFILIPPIS, and others known and unknown, and representations contained in the Offering Materials that were provided to the investors.

6. The Offering Materials stated that US Biofuel was offering up to 1,000,000 shares of the Company's common stock at a price of $1.00 per share. The Offering Materials stated that the minimum investment was generally $5,000. The 12/29/06 PPM featured on the cover page that the Company would pay a commission of no greater than ten percent of the amount invested, and that the maximum commission that would be paid, if the company sold one million shares, would be $100,000 in total. The 12/29/06 PPM stated that the Company "reserves the right to engage brokers and dealers . . . to Offer shares, to which it will pay a commission of no more than $0.10 per Share for each Share placed as a result of their efforts." The 12/29/06 PPM also stated that the "Company has not engaged any brokers or dealers to offer the shares."

## **The Scheme to Defraud**

7.  ROBERT J. LAWS, STACEY DEFILIPPIS, and others known and unknown, sold or caused the sale of the US Biofuel Securities by, among other methods, the following: (a) using fraudulent Offering Materials which contained numerous material misrepresentations and omissions including misrepresentations concerning the commissions to be paid to brokers, and the use of the proceeds of the offering, and omissions concerning the prior criminal histories of LAWS and DEFILIPPIS; (b) operating a securities "boiler room" from US Biofuel's offices in New York, New York; (c) contacting potential investors by telephone, a tactic commonly referred to as "cold calling"; (d) using fraudulent, high-pressure sales tactics to induce investors to purchase the US Biofuel Securities; (e) making materially false and misleading oral representations and material omissions to purchasers of the US Biofuel Securities; and (f) converting investor funds to their own personal use and benefit.  In furtherance of the scheme, LAWS agreed to pay DEFILIPPIS, and others known and unknown, secret commissions of up to approximately 30 percent of the proceeds derived from the sale of the US Biofuel Securities to their clients, with the understanding that these commissions would not be disclosed to the clients.  Further, LAWS agreed to pay additional secret commissions of approximately five percent of the proceeds derived

4

from the sale of the US Biofuel Securities by any brokers recruited by a Confidential Informant working at the direction of the FBI (the "CI"), with the understanding that these commissions would not be disclosed to the clients.

8. In the course of this scheme, from in or about October 2006 through in or about May 2007, LAWS, DEFILIPPIS, and their co-conspirators raised approximately $915,000 from victim investors.

### The Fraudulent Offering Materials

9. The Offering Materials that were distributed to investors at the direction of LAWS contained materially false and misleading statements, and failed to disclose material information, including the following:

   a. The Offering Materials falsely claimed that the net proceeds from the offering would be used for working capital and other corporate purposes, including legal and other fees related to the offering. In truth and in fact, the proceeds from the offering were used primarily to make secret payments to LAWS, DEFILIPPIS, and others known and unknown;

   b. The Offering Materials falsely claimed that at most only ten percent of the projected proceeds would be used to pay commissions to brokers. In truth and in fact, secret commissions of up to approximately 30 percent were paid to DEFILIPPIS and others known and unknown;

5

c.  The Offering Materials failed to disclose that LAWS, President, Chief Executive Officer, and Director of US Biofuel, had previously been convicted following a trial in New York State Supreme Court of engaging in a Scheme to Defraud in the 1st degree, and Grand Larceny in the 3rd degree, and had been sentenced to a term of incarceration; and

d.  The Offering Materials failed to disclose that DEFILIPPIS, the sales manager for US Biofuel, had been charged in the United States District Court for the District of Iowa with wire fraud, and had pleaded guilty to those charges on or about March 30, 2007, and that charges involving wire fraud and racketeering were also pending against DEFILIPPIS in the United States District Court for the Southern District of New York.

### Oral Misrepresentations and Material Omissions

10.  In addition to the written misrepresentations contained in the Offering Materials, LAWS, DEFILIPPIS, and others known and unknown, sold the US Biofuel Securities, or aided and abetted the sale of the US Biofuel Securities, based on oral misrepresentations and fraudulent omissions.  LAWS distributed to US Biofuel telemarketers scripts that contained false and misleading sales pitches.

11.  DEFILIPPIS and others sold the US Biofuel Securities by soliciting customers over the telephone using, among other things, false and misleading sales pitches, including

claims that investors could expect that their initial investment would be worth ten to 15 times its current value in the next 12 months. In these oral solicitations, DEFILIPPIS and others failed to disclose that secret commissions of up to approximately 30 percent were paid to DEFILIPPIS and others.

### The Misappropriation of the Proceeds

12. Investors were instructed by LAWS, DEFILIPPIS and others known and unknown to make their checks payable to US Biofuel, to mail their checks to US Biofuel in New York, New York, or to wire their money to US Biofuel's bank account at Wachovia Bank in New York, New York (the "US Biofuel Account").

13. LAWS caused investors' checks to be deposited into the US Biofuel Account, from which LAWS paid DEFILIPPIS, and others known and unknown, secret commissions from the sales of US Biofuel Securities.

14. From in or about October 2006 through in or about May 2007, US Biofuel raised approximately $915,100 in investor funds. Among the uses of the investors' funds were the following:

   a. At least approximately $175,000 was paid by check to telemarketers of US Biofuel, including approximately $100,526 paid to STACEY DEFILIPPIS, the defendant; and

   b. Approximately $45,000 was withdrawn from the US Biofuel account using an ATM card and approximately $39,000 in

7

investor funds were withdrawn from the account as bank counter withdrawals.

### The Conspiracy

15. From in or about October 2006 through in or about May 2007, in the Southern District of New York and elsewhere, ROBERT J. LAWS, and STACEY DEFILIPPIS, the defendants, and others known and unknown, unlawfully, willfully, and knowingly, did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, to commit: (a) fraud in the purchase and sale of securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5; (b) mail fraud, in violation of Title 18, United States Code, Section 1341; and (c) wire fraud, in violation of Title 18, United States Code, Section 1343.

### Objects Of The Conspiracy

### Securities Fraud

16. It was a part and an object of the conspiracy that ROBERT J. LAWS, and STACEY DEFILIPPIS, the defendants, and their co-conspirators not named as defendants herein, unlawfully, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of the

US Biofuel Securities, manipulative and deceptive devices and contrivances, in violation of Title 15, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon purchasers and sellers of the securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

### Mail Fraud

17.  It was further a part and an object of this conspiracy that ROBERT J. LAWS, and STACEY DEFILIPPIS, the defendants, and their co-conspirators not named as defendants herein, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, for the purpose of executing such scheme and artifice to defraud and attempting so to do, placed and caused to be placed in post offices and authorized depositories for mail matter, matters and things to be sent and delivered by the Postal Service, and deposited and

caused to be deposited matters and things to be sent and delivered by private and commercial interstate carriers, and took and received therefrom such matters and things, and knowingly caused to be delivered by mail and such carriers according to the direction thereon, such matters and things, all in violation of Title 18, United States Code, Section 1341.

### Wire Fraud

18. It was further a part and an object of this conspiracy that ROBERT J. LAWS, and STACEY DEFILIPPIS, the defendants, and their co-conspirators not named as defendants herein, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

### Means and Methods of the Conspiracy

19. Among the means and methods by which LAWS, DEFILIPPIS, and their co-conspirators would and did carry out the conspiracy were the following:

    a. Making materially false and fraudulent

statements about the US Biofuel Securities, and the Company over the telephone and using high pressure sales tactics to induce investors to send funds to US Biofuel in connection with purchases of the US Biofuel Securities;

      b.  Making materially false and misleading statements in the Offering Materials about the US Biofuel Securities, and the Company to induce investors to send funds to US Biofuel in connection with purchases of the US Biofuel Securities and distributing said Offering Materials interstate through the mails;

      c.  Paying excessive, undisclosed commissions of up to approximately 30 percent of the proceeds raised through the sales of the US Biofuel Securities to brokers by checks and wire transfers from the US Biofuel Account; and

      d.  Misappropriating and converting a substantial portion of the proceeds of the sales of the US Biofuel Securities for their own use and benefit and to pay expenses necessary to continue the scheme.

### Overt Acts

20.  In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

      a.  In or about May 2006, LAWS told the CI in a

recorded phone call that LAWS was in the process of getting offices set up at 40 Exchange Place to raise money for a biofuel deal, and further stated that the deal would pay commissions of 20 percent of the money raised, and that if more than $100,000 was raised in one month, then the amount paid out would be 30 percent.

  b. In or about June 2006, LAWS told the CI in a recorded phone call that for any investment under $100,000 that the CI brought, the CI would be paid 20 percent, and that for any investment over $100,000, the CI would receive an additional ten percent bonus.

  c. In or about June 2006, LAWS told the CI in a recorded phone call that LAWS wanted the CI to help recruit telemarketers to solicit investors from LAWS's new office at 40 Exchange Place, and LAWS offered the CI a five percent override, or commission, on any funds raised by people recruited to work at the office by the CI.

  d. On or about August 23, 2006, in a recorded phone call, the CI informed LAWS that the CI had commitments from two individuals to invest in US Biofuel.

  e. On or about August 23, 2006, LAWS sent via Federal Express from New York, New York, to the CI approximately two copies of a US Biofuel private placement memorandum, along with subscription agreements with "sign here" tabs, indicating

12

where the investors should sign.

        f. On or about September 14, 2006, the CI met in person with LAWS at 40 Exchange Place, New York, New York, and delivered to LAWS two checks payable to US Biofuel in the amount of $20,000 each, that were purportedly from two investors that the CI had solicited, although in reality the checks were drawn on undercover FBI bank accounts.

        g. On or about September 19, 2006, in a recorded phone call, LAWS told the CI that the two checks referenced in subparagraph (f), above, had cleared the bank, and asked the CI how LAWS should make out the commission check for the CI.

        h. Subsequently, on or about September 20, 2006, the CI provided LAWS with wire transfer coordinates for an undercover corporate bank account utilized by the FBI (the "Undercover Account").

        i. On or about September 21, 2006, approximately $12,000 was wire transferred from the US Biofuel Account in New York, New York, to the Undercover Account, amounting to approximately 30 percent of the $40,000 provided by the CI to LAWS on or about September 14, 2006.

        j. On or about October 18, 2006, at a recorded meeting at the US Biofuel office at 40 Exchange Place in New York, New York, LAWS informed the CI that he was employing approximately nine people to solicit investments in US Biofuel,

13

that the telemarketers had raised $50,000 in the last week, and that one woman had brought in $25,000 in a week. LAWS introduced the CI to STACEY DEFILIPPIS, and described DEFILIPPIS as his "superstar."

        k. On or about March 28, 2007, the CI and an undercover FBI agent (the "UC") met with LAWS and DEFILIPPIS at the US Biofuel office at 40 Exchange Place, New York, New York, where LAWS told the UC that he was paying out 20 percent commissions, that he was not following "guidelines 100 percent," and that the private placement memorandum disclosed commissions of ten percent. LAWS provided to the UC marketing materials for US Biofuel, including a copy of the 12/29/06 PPM.

        l. In addition, during the meeting at 40 Exchange Place in New York, New York, on or about March 28, 2007, LAWS introduced DEFILIPPIS to the CI and UC, described DEFILIPPIS as his top seller averaging $100,000 per month in sales, and stated that DEFILIPPIS had brought in approximately 20 of the Company's approximately 35 first round investors. DEFILIPPIS informed the UC that she had been with the company since the end of October 2006, and that she was being paid 20 percent commissions, even though the Offering Materials said commissions were ten percent. DEFILIPPIS made a telephone call to a potential investor, and gave a sales pitch where she informed the potential investor that she believed the potential investor could expect returns of 10-15

14

times the initial investment in the next twelve months.

   m. On or about March 30, 2007, the UC met with LAWS at the US Biofuel office at 40 Exchange Place, in New York, New York, and informed LAWS that the UC had obtained two investments of $10,000 each, totaling $20,000.  LAWS informed the UC that he would pay the UC commissions of 25 percent on the investments the UC obtained.

   n. After the FBI provided $20,000 through undercover bank accounts to US Biofuel as purported investments, on or about April 24, 2007, the UC met with LAWS at 40 Exchange Place, New York, New York, and LAWS signed and delivered to the UC a check in the amount of $5,000, amounting to 25 percent of the $20,000 investment purportedly raised by the UC and provided to US Biofuel.

   o. On or about May 1, 2007, approximately $1,000 was wire transferred from the US Biofuel Account in New York, New York, to the Undercover Account through which the CI had previously received a purported commission payment, amounting to approximately five percent of the purported $20,000 investment provided by the UC, and constituting the five percent override commission promised by LAWS to the CI, for any brokers the CI recruited to work at the US Biofuel telemarketing room.

   (Title 18, United States Code, Section 371).

**COUNT TWO**

**(Securities Fraud)**

The Grand Jury further charges:

21.  The allegations set forth in paragraphs 1 through 14, 19, and 20 are repeated and realleged as if set forth fully herein.

22.  From in or about October 2006 through in or about May 2007, in the Southern District of New York and elsewhere, ROBERT J. LAWS, and STACEY DEFILIPPIS, the defendants, unlawfully, wilfully, and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce and of the mails, did use and employ, in connection with the purchase and sale of the securities of US Biofuel, manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud, (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, namely purchasers and sellers of US Biofuel Securities.

(Title 15, United States Code, Sections 78j(b) and 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5;
Title 18 United States Code, Section 2.)

**FORFEITURE ALLEGATION**

23. As a result of committing securities fraud, and conspiring to commit securities, wire and mail fraud, as alleged in Counts One and Two of this Indictment, in violation of Title 18, United States Code, Sections 371, and Title 15, United States Code, Sections 78j(b) & 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5, ROBERT J. LAWS and STACEY DEFILIPPIS, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offenses.

**Substitute Asset Provision**

24. If any of the forfeitable property, as a result of any act or omission of the defendants:

    a.   cannot be located upon the exercise of due diligence;

    b.   has been transferred or sold to, or deposited with, a third person;

    c.   has been placed beyond the jurisdiction of the Court;

    d.   has been substantially diminished in value; or

    e.   has been commingled with other property which

cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b) & Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 981(a)(1), 982, Title 21, United States Code, Section 853(p), and Title 28, United States Code, Section 2461).

_____
FOREPERSON

_____
MICHAEL J. GARCIA
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

---

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

- v. -

ROBERT J. LAWS, and
STACEY DEFILIPPIS,

       Defendants.

---

### INDICTMENT

07 Cr. __

(18 U.S.C. § 371; 15 U.S.C. §§ 78j(b)
& 78ff; 17 C.F.R. § 240.10b-5; and
18 U.S.C. § 2)

       MICHAEL J. GARCIA
       United States Attorney.

**A TRUE BILL**

    *Madeline J. Coulon*
         Foreperson.

---

*June 26 2007*
*Indictment filed*
*Case assigned to Judge Berman*
    *Freeman, USMJ*